UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:15-CV-00014-GNS-HBB

M.D., a minor, by and through her next
friends and parents, BRENT DEWEESE
and JANNA DEWEESE                                                                      PLAINTIFF

v.

BOWLING GREEN INDEPENDENT
SCHOOL DISTRICT                                                                        DEFENDANT

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendant's Motion for Summary Judgment (DN 26). For the reasons discussed below, Defendant's Motion for Summary Judgment is **GRANTED**.

I.  **BACKGROUND**

M.D. is currently in the eleventh grade at Bowling Green High School ("BGHS") in Bowling Green, Kentucky. Prior to M.D.'s eighth-grade year at Bowling Green Junior High School, during the 2013-2014 academic year, she successfully tried out for the BGHS varsity cheerleading team. (M.D. Dep. 11:20-12:2, Oct. 27, 2015, DN 26-4). During that year, the BGHS cheerleading team competed in a national cheerleading competition in Orlando, Florida. (Wimpee Dep. 20:13-24, Dec. 17, 2015, DN 26-9). M.D. was thirteen years of age at the time of the competition. (M.D. Dep. 11:20-12:2). On February 10, 2014, the cheerleading team and coaches returned from Orlando to Bowling Green on a chartered bus. M.D. was seated near the

1

front section of the bus with the other female cheerleaders, while all six male cheerleaders were seated at the back of the bus. (M.D. Dep. 51:20-53:6). At some point during the trip, M.D. moved to the back of the bus to find a quiet place to sleep, as she had been up nearly twenty-four hours and had to cheer at a basketball game that night. (M.D. Dep. 53:21-54:12). She fell asleep in the aisle of the bus near where the male cheerleaders were seated. (M.D. Dep. 53:21-54:12).

M.D. awoke to realize that male cheerleader and eleventh-grade student, Ronale Morris ("Morris"), had one hand underneath her sports bra and the other in her underwear, squeezing her buttocks. (M.D. Dep. 60:21-61:7, 62:3-6). When M.D. immediately got up and retreated to the front of the bus, Morris followed her but they did not speak. (M.D. Dep. 60:21-61:7, 62:22-63:3). M.D. did not inform anyone of the assault for the remaining thirty minutes of the trip. (M.D. Dep. 63:13-64:5). When the bus arrived back home, the cheerleaders congregated in the arena at BGHS to wait for their respective rides. (M.D. Dep. 71:10-25). When another cheerleader, Sam Hafley ("Hafley"), inquired as to why she was upset, M.D. confided in him about the sexual assault that occurred on the bus. (M.D. Dep. 72:7-17; Fields Dep. Ex. 3, DN 26-7). M.D. was picked up by her older sister to whom she also confided about the assault. (M.D. Dep. 73:4-22).

At the basketball game that night, Hafley, with M.D.'s permission, informed the BGHS assistant cheerleading coach Djuan Frye ("Frye") of the assault. (M.D. Dep. 80:20-81:4). Coach Frye and another assistant coach, Brette Wimpee ("Wimpee"), took M.D. into a separate room to ask her about the assault, and she told them about the incident. (Wimpee Dep. 58:3-8, 59:2-13; M.D. Dep. 81:17-5). Frye and Wimpee then approached Morris, who was present at the basketball game. Morris admitted to the assault, and Frye immediately took Morris home from the game. (Wimpee Dep. 61:19-63:13). Morris was dismissed from the cheerleading team that

night by head coach Brittany Smith ("Smith"). (M.D. Dep. 105:25-106:4; B. Deweese Dep. 32:19-24, Dec. 16, 2015, DN 26-5). While at the game, M.D. telephoned her parents and informed them of the assault. (M.D. Dep. 83:19-6; B. Deweese Dep. 31:8-23). Brent Deweese ("Deweese"), M.D.'s father, immediately telephoned principal Gary Fields ("Fields") to inform him of the incident. (B. Deweese Dep. 34:14-21; Fields Dep. 12:17-13:13, June 9, 2016, DN 26-7).

That next morning on February 11, 2014, Fields called Morris and Hafley into his office and asked them to give a written statement of the incident on the bus. (Fields Dep. 13:17-14:8, Ex. 2, 3). Morris and Hafley's statements were consistent with Deweese's report of the incident. (Fields Dep. Ex. 2, 3). Fields also met with Deweese and contacted the Bowling Green Police Department after Deweese indicated that he wanted to contact the authorities. (Fields Dep. 16:25-17:9). Fields then contacted Joe Tinius ("Tinius"), the superintendent of Defendant Bowling Green Independent School District ("BGISD"). (Fields Dep. 18:12-24). Based on Fields' recommendation, Tinius decided to immediately transfer Morris to an alternative school for students with behavioral problems. (Tinius Dep. 32:24-33:4, June 9, 2016, DN 26-8; Fields Dep. 17:12-24). According to Tinius, Morris' school records revealed that he did not have any significant disciplinary issues prior to this assault. (Tinius Dep. 32:4-23). Wimpee also stated that Morris had no previous behavioral issues while on the cheerleading team. (Wimpee Dep. 36:18-23). Furthermore, M.D. testified that Morris' actions were unexpected and were not representative of his past behavior. (M.D. Dep. 63:6-14).

Morris remained at the alternative school for the remainder of the 2013-2014 academic school year. (Fields Dep. 56:16-22). Twice that semester, once in April and again in May, the Alternative Placement Committee recommended to Tinius that Morris return to BGHS due to his

3

good behavior, attendance and performance. (Tinius Dep. 40:1-22). While Tinius had never before rejected a recommendation of the Alternative Placement Committee, he rejected both of the recommendations. (Fields Dep. 66:8-67:4). M.D. did not see Morris for the remainder of the 2013-2014 school year, as he was not present at BGHS and no longer on the cheerleading team. (M.D. Dep. 93:11-16).

In August 2014, M.D. began her freshman year at BGHS. One month after school started, Morris was allowed to return to BGHS. (Tinius Dep. 37:3-23). Upon discovering Morris was back at BGHS, Deweese met with Tinius to communicate his displeasure with the decision to allow Morris to return. (Tinius Dep. 43:16-45:6). Deweese told Tinius that he believed that Morris' presence would "revictimize" his daughter and affect her experience as a student at BGHS. He also informed Tinius that he was worried for his daughter's safety. (Tinius Dep. 44:2-45:17). In a subsequent e-mail, Deweese informed Tinius that Morris' return would unfairly subject M.D. to a hostile atmosphere where she would face her attacker on a daily basis. (Tinius Dep. 47:21-48:1, Ex. 3). Tinius and Fields both informed Morris and his mother that if he had any contact with M.D. while at BGHS he would be enrolled back in the alternative school "no questions asked." (Fields Dep. 59:9-13; Tinius Dep. 48:3-13). Fields also instructed the assistant principals to monitor the hallways during class change to watch out for potential contact between Morris and M.D. (Fields Dep. 62:19-64:10). Additionally, Fields compared M.D. and Morris' class schedules to ensure that they would not have any classes together. (Fields Dep. 59:23-61:1). Upon learning that M.D. and Morris had the same lunch period, Fields required Morris to eat lunch in a separate room. (Fields Dep. 61:2-20).

M.D. testified that every day she saw Morris in the cafeteria while he was picking up his lunch and on her way to her sixth period class. (M.D. Dep. 110:22, 113:21-114:15). On one

4

occasion, she took an obscure route to her sixth period class to avoid seeing him. (M.D. Dep. 109:21-24). Morris, as a member of the BGHS multimedia staff, was assigned to take photographs of sporting events and would stand on the side lines, near where M.D. was cheering, to do so. (M.D. Dep. 117:18-119:1). Deweese complained of the close proximity of Morris to M.D. during these events, and Fields instructed Morris' teacher that he was to be reassigned from taking photographs at sporting events. Additionally, Fields once again reiterated to Morris that he was not to have any contact with M.D. (Fields Dep. 61:21-12; B. Deweese Dep. 118:10-22). M.D. testified that Morris neither attempted to make contact with her nor took any actions towards her during the 2014-2015 school year. (M.D. Dep. 114:16-21, 119:24-120:10). Moreover, M.D. testified that since the February 2014 assault, she has experienced no other incidents of sexual harassment at BGHS by anyone. (M.D. Dep. 138:8-17). Morris graduated from BGHS in May 2015. Since then, M.D. has only seen Morris once, at homecoming in the fall of 2015; she testified that Morris did not make any contact with her at this event. (M.D. Dep. 133:4-14).

M.D. testified that Wimpee began treating her differently after she reported the assault, changing M.D.'s position on the cheerleading team from flier to base. (M.D. Dep. 124:5-19). Wimpee testified that this was because M.D. grew in size and was better suited as a tumbler instead of flier. (Wimpee Dep. 91:10-17). When M.D. hurt her ankle at the beginning of the school year, Wimpee pulled her from the routine that would be performed at the regional competition in October. (M.D. Dep. 124:8-19). M.D. also testified that Wimpee would give her "dirty looks" during practice. (M.D. Dep. 124:8-19). Despite the alleged treatment by Wimpee, M.D. never informed anyone affiliated with the Defendant about the way she was treated by Wimpee. (M.D. Dep. 124:8-12). Deweese notified Fields that he felt M.D. was being ostracized

from the other cheerleaders and voiced his concerns about an upcoming tryout in light of M.D.'s ankle injury. (Fields Dep. 40:5-42:19). Fields held a meeting with Wimpee and Smith at which Fields instructed them to provide an alternative tryout time for M.D. and cautioned that they were not to treat M.D. differently than any other member of the cheerleading team. (Fields Dep. 40:5-42:19).

## II. JURISDICTION

Federal courts have "federal question" jurisdiction "of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

## III. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine issue of material fact when "looking to the record as a whole, a reasonable mind could come to only one conclusion . . . ." *Mickler v. Nimishillen & Tuscarawas Ry. Co.*, 13 F.3d 184, 186 (6th Cir. 1993) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)). "When moving for summary judgment the movant has the initial burden of showing the absence of a genuine dispute as to a material fact." *Automated Sols. Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 520 (6th Cir. 2014) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The burden then shifts to the nonmovant, who must put forth enough evidence to show that there exists 'a genuine issue for trial.'" *Id.* (citing *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004)).

While the Court views the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show the existence of some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

6

586 (1986) (citations omitted). Rather, the non-moving party must present specific facts proving that a genuine factual issue exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

## IV.   DISCUSSION

M.D. brings this action for student-on-student sexual harassment claiming violations of Title IX of the Educational Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681-1688. Title IX provides in relevant part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance . . . .

20 U.S.C. § 1681(a). "[A] federal funding recipient may be liable under Title IX for deliberate indifference to student-on-student sexual harassment 'in certain limited circumstances.'" *Stiles ex rel. D.S. v. Grainger Cty.*, 819 F.3d 834, 848 (6th Cir. 2016) (quoting *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 643 (1999)).

> In *Davis*, the Supreme Court established that Title IX may support a claim for student-on-student sexual harassment when the plaintiff can demonstrate the following elements: (1) the sexual harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school, (2) the funding recipient had actual knowledge of the sexual harassment, and (3) the funding recipient was deliberately indifferent to the harassment.

*Soper v. Hoben*, 195 F.3d 845, 854 (6th Cir. 1999) (citing *Davis*, 526 U.S. at 633). The parties do not dispute that the BGISD is a recipient of federal funding and financial assistance for purposes of 20 U.S.C. § 1681(a) and therefore falls under Title IX. The issue before this Court is

7

whether M.D. has provided evidence in the record from which a reasonable jury could conclude that the elements of M.D.'s Title IX claim are satisfied.

### A. Severity of Harassment

With regard to the first element of a prima facie case, the Supreme Court in *Davis* stated that "a plaintiff must establish sexual harassment of students that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Davis*, 526 U.S. at 651. "Clearly, a sexual assault constitutes one of the most severe forms of sexual harassment imaginable and has the potential to be so traumatic that the victim is effectively denied equal access to the educational opportunities or benefits provided by the school." *Marcum ex rel. C.V. v. Bd. of Educ. of Bloom-Carroll Local Sch. Dist.*, 727 F. Supp. 2d 657, 668 (S.D. Ohio 2010) (citing *Soper*, 195 F.3d at 855). *See Soper*, 195 F.3d at 854-55 (holding that rape and sexual abuse "obviously qualifies as being severe, pervasive, and objectively offensive sexual harassment that could deprive [plaintiff] of access to the educational opportunities provided by her school."). For the purpose of summary judgment, the sexual assault described by M.D. unquestionably qualifies as the type of conduct that the Sixth Circuit has held to be "severe, pervasive, and objectively offensive sexual harassment that could deprive [plaintiff] of access to the educational opportunities provided by her school." *Id.* at 855. M.D., a thirteen-year-old girl, awoke on a school trip to discover Morris, a seventeen-year-old male, placing his hands down her pants and in her shirt. (M.D. Dep. 71:10-25). There is no dispute of the event, as Morris admitted this happened in a written statement taken by Fields. (Fields Dep. 13:17-14:8; Fields Dep. Exs. 2, 3)

Additionally, M.D. asserts that she was deprived of educational opportunities or benefits as a result of the assault as evidenced by a decline of her grades and heightened anxiety, stress, and depression. (M.D. Dep. 98:21-99:2, 101:8-12). Although Defendant disputes the extent to which M.D.'s grades suffered, the Court is to view the facts most favorably toward M.D. at the summary judgment stage. Accordingly, the Court holds that a reasonable jury could find that the sexual assault satisfies the first element of a claim under the *Davis* test.

**B.     Actual Notice**

Regardless of whether the assault satisfies the first element, it is undisputed that Defendant did not have prior knowledge of a significant risk that an assault involving Morris might occur, much less that Morris posed a risk to M.D. This lack of prior knowledge defeats M.D.'s claim as a matter of law. The second element of the *Davis* test requires that the "defendant have actual knowledge of the sexual harassment . . . ." *Soper*, 195 F.3d at 854 (citing *Davis*, 526 U.S. at 651). "To demonstrate Defendant's actual knowledge of the harassment in a case based on a sexual assault, a plaintiff may show the [defendant] had preexisting knowledge of the harasser's prior misconduct." *Doe v. Univ. of Ky.*, No. 5:15-CV-00296-JMH, 2016 WL 4578328, at *3 (E.D. Ky. Aug. 31, 2016) (citing *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1293 (11th Cir. 2007)). *See also C.K v. Bell. Cty. Bd. of Educ.*, 865 F. Supp. 2d 795, 801 (E.D. Ky. 2012) ("Thus, the question is whether prior complaints [regarding the assaulter] alerted a school official to a 'substantial risk of sexual abuse to children in the school district.'" (quoting *Williams ex rel. Hart v. Paint Valley Local Sch. Dist*., 400 F.3d 360, 363 (6th Cir. 2005))).

M.D. has not established that anyone in the school district possessed any actual knowledge of a substantial risk of misconduct by Morris prior to the incident on February 10,

2014. Tinius testified that Morris' school records revealed that he did not have any significant past disciplinary problems and this event was "one bad decision" on the part of Morris. (Tinius Dep. 32:4-23). Wimpee testified that there were no issues with Morris' prior behavior on the cheerleading team. (Wimpee Dep. 36:18-23). Furthermore, M.D.'s testimony confirms that the assault by Morris was unexpected even by her and was not representative of his past behavior. (M.D. Dep. 63:6-14). Thus, there is no proof that Defendant had prior knowledge that Morris posed a significant risk to M.D. *See Doe*, 2016 WL 4578328, at *3 (noting that all of the plaintiff's claims related to events that occurred after the alleged rape was reported because the plaintiff did not allege that anyone affiliated with the defendant possessed any actual knowledge of misconduct by the harasser prior to the alleged rape).

M.D. attempts to avoid the knowledge requirement by arguing that a single event can support a claim under Title IX. Specifically, M.D. asserts "several courts have rejected such an untenable condition" regarding the necessity that the Defendant have prior knowledge that Morris posed a significant risk to M.D. before liability could attach. (Pl.'s Resp. 11). The cases cited by M.D., however, do not support this proposition. In *Vance v. Spencer County Public School District*, 231 F.3d 253 (6th Cir. 2000), the Sixth Circuit indicated that a single incident could give rise to Title IX liability but still analyzed the knowledge requirement, finding "in this case, it is undisputed that [the defendant] had actual knowledge." *Id* at 259. In *Williams v. Board of Regents*, the Eleventh Circuit held that the plaintiff's claims could survive a motion to dismiss after one instance of rape because the defendants had "preexisting knowledge of [assaulter's] past sexual misconduct . . . ." *Williams*, 477 F.3d at 1293. In *M. v. Stamford Board of Education*, No. 3:05-CV-0177 WWE, 2008 WL 2704704 (D. Conn. July 7, 2008), the plaintiff was sexually assaulted by a fellow student and notified the defendant by letter a few days after

10

the assault. The court stated that the single incident of assault could satisfy the first element of the *Davis* test; however, summary judgment was precluded "only as to the harassment that followed the February 5 note" informing the defendant of the assault. *M.*, 2008 WL 2704704, at *9, *decision vacated in part on reconsideration sub nom. by M. ex rel. Mr. M. v. Stamford Bd. of Educ.*, No. 3:05-CV-0177 (WWE), 2008 WL 4197047 (D. Conn. Sept. 9, 2008).[1] Accordingly, none of the cases cited by M.D. support the proposition that prior knowledge is not necessary in instances involving a single sexual assault.

Under the undisputed facts of this case, Defendant had no prior knowledge of any danger Morris posed to any students before the February 2014 incident. For this reason, Plaintiff cannot satisfy the second prong of *Davis*.

### C. Deliberate Indifference

The deliberate indifference standard set forth in *Davis* sets a high bar for plaintiffs to recover under Title IX. *Stiles ex rel. D.S.*, 819 F.3d at 848 (citing *Doe v. Galster*, 768 F.3d 611, 619 (7th Cir. 2014)). It prohibits a funding recipient's response to known peer harassment that is "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. This standard is not a "mere 'reasonableness' standard", and "there is no reason why courts . . . [can]not identify a response as not 'clearly unreasonable' as a matter of law." *Id*. at 649. "The Supreme Court emphasized in *Davis* that federal funding recipients need not 'purg[e] their schools of actionable peer harassment' or 'engage in particular disciplinary action' to avoid Title IX liability." *Stiles ex rel. D.S.*, 819 F.3d at 848 (alteration in original) (quoting *Davis* 526 U.S. at 648; *Vance* 231 F.3d at 260). Likewise, Title IX does not give victims a right to "make

---

[1] M.D. also cites to *Doe v. School Administrative District No. 19*, 66 F. Supp. 2d 57 (D. Me. 1999), in support of her argument. This case involved teacher-on-student harassment rather than student-on-student, however, which renders it inapposite.

11

particular remedial demands." *Davis*, 526 U.S. at 648; *Vance*, 231 F.3d at 260. As the Sixth Circuit has cautioned, "courts should not second guess the disciplinary decisions that school administrators make." *Vance*, 231 F.3d at 260 (citing *Davis*, 526 U.S. at 648).

M.D. has not shown that a reasonable jury could find that the school administrators in this case acted with deliberate indifference in their response to the assault. The evidence demonstrates that the morning after the incident occurred, Fields began investigating the situation and took written statements from Morris and Hafley.[2] (Fields Dep. 13:17-14:8). *See Stiles*, 819 F.3d at 849 (stating "the school investigated promptly and thoroughly by interviewing [the plaintiff], [and] interviewing other students and teachers" in concluding the defendant did not act with deliberate indifference). When Deweese expressed that he would like to contact authorities during their meeting, Fields telephoned the police for him. (Fields Dep. 16:25-17:9). *See S.S. v. E. Ky. Univ.*, 532 F.3d 445, 455 (6th Cir. 2008) (noting that the defendant promptly reported the assault to the police in support that defendant did not act with deliberate indifference in its response to an assault). On that same day, the decision was made by Tinius to remove Morris from BGHS and place him in the alternative school. (Tinius Dep. 32:24-33:4). Thereafter, Tinius rejected the alternative school's committee recommendation that Morris should be able to return to BGHS twice, although he had never overruled the committee's recommendation before. (Fields Dep. 66:8-67:4). *See Patterson v. Hudson Area Sch.*, 551 F.3d 438, 459 (6th Cir. 2009) (holding the defendant was not deliberately indifferent where "the school took action whenever there was a reported incident, including counseling the victim,

---

[2] Title IX requires that "actual notice of the situation [be provided] to an 'appropriate person,' who was, at a minimum, an official of the educational entity with authority to take corrective action and to end discrimination . . . ." *Johnson v. Galen Health Insts., Inc.*, 267 F. Supp. 2d 679, 684 (W.D. Ky. 2003) (stating (citing *Klemencic v. Ohio State Univ.*, 263 F.3d 504 (6th Cir. 2001)). As principal, Fields would be considered an "appropriate person."

12

meeting with the offenders and threatening them with suspension, notifying the parents, and alerting teachers to the problem." (citing *Biggs v. Bd. of Educ. of Cecil Cty.*, 229 F. Supp. 2d 437 (D. Md. 2002)). Considering the prompt and thorough response of Defendant in disciplining Morris, it cannot be said that Defendant's actions were "clearly unreasonable" in response to the assault.[3] To the contrary, the record reflects that Fields and Tinius took immediate steps to remove Morris from BGHS once they learned of the assault.

When Deweese objected to Morris' return to BGHS the following school year, Defendant took proactive steps to prevent future contact between Morris and M.D. Fields compared the class schedules of Morris and M.D. to ensure that they did not have any classes together.[4] (Fields Dep. 59:23-61:1). When it was discovered that the two shared the same lunch period, Fields instructed Morris to eat his lunch in a separate room and Morris did so. (Fields Dep. 61:2-

---

[3] M.D. alleges that Defendant has failed to comply with administrative regulations promulgated under Title IX by failing to involve the Title IX coordinator for the school system, failing to file a report with the coordinator, and failing to notify M.D. of her rights under Title IX. (Pls.' Resp. 8). "However, the Supreme Court has held that a funding recipient's failure to comply with the regulation 'does not establish the requisite actual notice and deliberate indifference for a private right of action . . . .'" *Ross v. Corp. of Mercer Univ.*, 506 F. Supp. 2d 1325, 1353 (M.D. Ga. 2007) (quoting *Gebser*, 524 U.S. at 292). "In other words, although the Department of Education could enforce these requirements administratively, the Supreme Court has 'never held . . . that the implied private right of action under Title IX allows recovery in damages for violation of those sorts of administrative requirements.' Accordingly, because [the student] cannot directly sue [the defendant] for violating regulations . . . any such violations cannot support a claim for deliberate indifference." *Id.* (internal citation omitted) (citing *Gebser*, 524 U.S. at 292).

[4] Courts have held that a plaintiff must experience further harassment after a defendant acquires knowledge of the initial harassment for his or her claim to be viable. *See Moore v. Murray State Univ.*, No. 5:12-cv-00178, 2013 WL 960320 (W.D. Ky. Mar. 12, 2013) (granting the defendant's motion to dismiss and noting "the complaint contains no allegations that any further harassment occurred after the assault."); *Yoona Ha v. Nw. Univ.*, No. 14-cv-00895, 2014 WL 5893292, at *2 (N.D. Ill. Nov. 13, 2014) (rejecting the argument that an occasional glimpse of the assailant and knowledge of his presence on campus without any further subsequent acts of harassment was sufficient to support a Title IX claim); *Thomas v. Meharry Med. Coll.*, 1 F. Supp. 3d 816, 827 (M.D. Tenn. 2014) ("[B]ecause Plaintiff did not continue to experience sexual harassment once he put Defendant on notice of [harasser's] conduct, there is no basis to find Defendant's response to Plaintiffs sexual harassment report amounted to deliberate indifference.").

20). On several occasions, Fields reiterated to Morris that he was not to have any contact with M.D. or he would be promptly sent back to the alternative school. Fields also instructed the assistant principals who monitor the hallways to ensure that Morris did not have contact with M.D., and M.D. testified that she did not have further contact with Morris. (Fields Dep. 59:9-13, 62:19-64:10; Tinius Dep. 48:3-13; M.D. Dep. 119:24-120:10). Furthermore, when Deweese complained about Morris taking photographs near the cheerleaders during a football game, Fields removed Morris from this task so that he would not be near M.D. while she was cheering at the sporting events. Following this incident, Fields again reiterated to Morris that he was not to have any contact with M.D. (Fields Dep. 62:1-12; B. Deweese Dep. 118:10-22). *See Stiles ex rel. D.S.*, 819 F.3d at 849 (finding no deliberate indifference where the defendant took proactive steps to reduce opportunities for future harassment such as placing the plaintiff and harasser in separate classes and having an employee monitor the plaintiff while in school). Significantly, the school's response ended all further contact between Morris and M.D. related to their attendance at BGHS.[5] (M.D. Dep. 119:24-120:10). *See M.P.T.C. v. Nelson Cty. Sch. Dist.*, No. 3:14CV-00041-JHM, 2016 WL 3264200, at *4 (W.D. Ky. June 14, 2016), *appeal dismissed* (6th Cir. Sept. 28, 2016) ("Additionally, Plaintiff fails to point to any evidence that suggests that any of the alleged deficient responses by the individual defendants resulted in further misconduct by the peer toward the Plaintiff.").

Under these circumstances, Defendant's actions taken after it learned of the assault represent the diametric opposite of deliberate indifference to M.D.'s harassment. Ultimately,

---

[5] M.D. admits that after the assault her only contact with Morris was when he attempted to add her on Instagram in the summer of 2014, before M.D. began her freshman year at BGHS and before Morris returned to BGHS. *See Davis*, 526 U.S. at 645 (concluding that "a recipient's damages liability [is limited] to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs.").

Defendant was completely successful in preventing any further harassment of M.D. after the single, unfortunate episode on the bus. Accordingly, Defendant's proactive and remedial actions were not clearly unreasonable in light of known circumstances.

M.D. argues that Defendant's lack of remedial measures in light of the notice to Defendant of the psychological harm she was suffering due to Morris' return to BGHS constitute deliberate indifference. (Def.'s Resp. 13). In support, M.D. cites two Sixth Circuit cases, *Vance v. Spencer County* and *Patterson v. Hudson Area Schools*. In *Vance*, the plaintiff was continually harassed by her harasser after the school had knowledge of the sexual harassment. *Vance*, 231 F.3d at 256-57. Despite recognizing the ineffectiveness of its remedial actions, the school took no additional action to end the harassment. *Id*. at 262. The Sixth Circuit held that "[w]here a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail," the school acts with deliberate indifference. *Id.* at 261. In *Patterson*, the defendant "responded to harassment largely by giving verbal reprimands to the [harassers]." *Patterson*, 551 F.3d at 448. Although the verbal reprimand would stop harassment by that student, it did not stop other students from harassing the plaintiff and the defendant was aware the verbal reprimands regarding a few students were not stopping the overall harassment. *Id*. The Sixth Circuit expanded *Vance* and held that because the reprimands were ineffective to stop continued harassment *by other students*, the defendant's continued use of the same reprimands created a factual issue as to deliberate indifference. *Id.* at 450. By stark contrast to *Vance* and *Patterson*, it is undisputed that M.D. did not experience any direct contact with Morris, let alone actual harassment by him or any other student after the school instituted its chosen punishment and remedial measures. M.D.'s psychological harm

15

from Morris' mere presence at BGHS does not equate to the actual harassment directed toward the plaintiffs in *Vance* and *Patterson*.

M.D.'s preferred punishment would have been for Defendant to either to expel Morris or leave him enrolled in the alternative school for the entirety of his senior year. The Supreme Court has cautioned against requiring defendants to "engage in particular disciplinary action" to avoid Title IX liability. *Stiles ex rel. D.S.*, 819 F.3d at 848 (quoting *Davis* 526 U.S. at 648; *Vance*, 231 F.3d at 260). The Supreme Court also explained that Title IX does not give victims a right to "make particular remedial demands." *Davis*, 526 U.S. at 648. Furthermore, it is not the job of a court to "second guess the disciplinary decisions that school administrators make." *Id*. Given this explicit guidance by the Supreme Court and the effective measures implemented by Defendant, Defendant's response was not deliberately indifferent as a matter of law.[6] Accordingly, M.D.'s claim fails on the third element of the *Davis* test, and summary judgment is granted for Defendant.

---

[6] Other courts have held that an institution's failure to take action or minimal efforts to protect the victim from his or her assailant is sufficient to create an issue of fact for a jury. *See, e.g.*, *Takla v. Regents of Univ. of Cal.*, No. 215CV04418CASSHX, 2015 WL 6755190, at *6-7 (C.D. Cal. Nov. 2, 2015) (denying the motion to dismiss on the basis that the plaintiff's allegations of insufficient remedial measures that did not prevent direct contact with the harasser were sufficient to state a claim of deliberate indifference); *Doe ex rel. Doe v. Derby Bd. of Educ.*, 451 F. Supp. 2d 438, 444-45 (D. Conn. 2006) (denying summary judgment because the school failed to take remedial action to reduce contact between the victim and the harasser); *Kelly v. Yale Univ.*, No. CIV.A. 3:01-CV-1591, 2003 WL 1563424, at *4-5 (D. Conn. Mar. 26, 2003) (finding that there was a factual issue as to whether the institution's minimal efforts to reduce further harassment violated Title IX). Contrary to M.D.'s assertion, however, those cases are distinguishable because the present case involved a single incident of harassment, and Defendant's remedial actions prevented further interaction between M.D. and Morris. Since the whole point of an institution's post-harassment response is to check the harassment, it seems inappropriate to find deliberate indifference where the offensive conduct is effectively thwarted following a school's chosen remedial course. *See Vance*, 231 F.3d at 260-61 (stating that a school must "take reasonable action in light of [the] circumstances to eliminate the behavior."). Thus, although the Court is sympathetic to M.D.'s emotional distress from the sexual assault, the record shows there was no interaction between Morris and M.D. after that incident.

16

### D.     Title IX Retaliation[7]

"Although Title IX does not explicitly provide a cause of action for retaliation, the Supreme Court has interpreted Title IX's prohibition of sexual discrimination to include retaliation." *Frazer v. Temple Univ.*, 25 F. Supp. 3d 598, 615 (E.D. Pa. 2014) (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74 (2005)). For M.D. to prevail on a claim of retaliation, she would have to show: "(1) that she engaged in conduct protected under Title IX, (2) that [the defendant] knew of the protected activity, (3) that she was subjected to an adverse action at the time, or after, the protected conduct took place, and (4) [the defendant's] decision to take the alleged adverse action would not have happened but for the report of sexual harassment." *Doe v. Rutherford Cty. Bd. of Educ.*, 86 F. Supp. 3d 831, 842 (M.D. Tenn. 2015).

M.D. cannot prove a *prima facie* claim of retaliation because Defendant is not liable for any actions of Wimpee. M.D. only alleges retaliatory actions by Wimpee and does not allege any retaliatory action by any school administrator. (Pl.'s Resp. 16-17). The Supreme Court in *Davis* held that "a recipient of federal funds may be liable in damages under Title IX *only for its own misconduct.*" *Davis*, 526 U.S. at 640 (emphasis added). The only capacity in which Wimpee is affiliated with Defendant is as an assistant cheerleading coach, and there has been no showing that Wimpee had the authority to make decisions or take corrective actions for the school district. There seems to be no question that all decisions regarding corrective action were made by Fields and Tinius. Moreover, when Deweese notified Fields that he felt M.D. was being ostracized and voiced his concerns about an upcoming tryout, Fields held a meeting with

---

[7] Without asserting a retaliation claim under Title IX in her Complaint, M.D.'s response to Defendant's motion for summary judgment contains the allegation that M.D. was retaliated against for reporting her sexual assault by assistant cheerleading coach Wimpee when Wimpee changed M.D.'s position on the cheerleading team from flyer to base and began treating her differently. (Pl.'s Resp. 16-17). The Court will ignore the insufficiency of M.D.'s pleadings and address the merits of the retaliation claim.

17

Wimpee and Smith, instructed them to provide an alternative tryout time for M.D., and cautioned that they were not to treat M.D. differently than any other member of the cheerleading team. (Fields Dep. 40:5-42:19). Additionally, M.D. never voiced her personal concerns to any school administrator regarding unfair treatment or retaliation. (M.D. Dep. 125:8-15). Accordingly, M.D. has not demonstrated that Defendant subjected her to an adverse action after her report of the assault. Thus, M.D.'s retaliation claim fails as a matter of law.

## V. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (DN 26) is **GRANTED**.

**Greg N. Stivers, Judge
United States District Court**

January 27, 2017

cc: counsel of record